CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED

3/31/2026
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| GENE B., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:24-cv-00746 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | By:     Hon. Thomas T. Cullen |
| SECURITY, | ) |        United States District Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff Gene B. ("Gene") filed suit in this court seeking review of the Commissioner of Social Security's ("Commissioner") final decision denying his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–433, 1601–1637. After a hearing, an administrative law judge ("ALJ") concluded that, despite his limitations, Gene could still perform a range of light work. Gene broadly challenges that conclusion, calling for reversal and remand on three grounds. But because the ALJ considered all the evidence in the record and adequately explained his rationale for the conclusions he reached, the Commissioner's final decision will be affirmed.

## I.    STANDARD OF REVIEW

The Social Security Act (the "Act") authorizes this court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The court's role, however, is limited; it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment"

for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted). Instead, in reviewing the merits of the Commissioner's final decision, a court asks only whether the ALJ applied the correct legal standards and whether "substantial evidence" supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 99–100 (1991)).

In this context, "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial-evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (internal quotation omitted). But "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social

Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his past relevant work (if any) based on his residual functional capacity ("RFC"); and, if not (5) whether he can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II.    RELEVANT PROCEDURAL HISTORY AND EVIDENCE

Gene filed for DIB and SSI benefits on December 30, 2021. (*See* R. 14; 227–238.) He claimed a disability onset date of January 1, 2019 (although he amended that date at the hearing before the ALJ (R. 40)), resulting from myriad health issues: depression, anxiety disorder, neurodevelopment disorder, attention deficit hyperactivity disorder ("ADHD"), osteoarthritis, lumbar radiculitis, insomnia, chronic diarrhea, pain in both knees, and pain in his wrists, left hand, and neck. (*See* R. 263.)  His claims were denied initially on February 18, 2022 (R. 97–109), and upon reconsideration on June 2, 2022 (R. 111–125).

Gene requested a hearing before an ALJ. (R. 157–58.) The ALJ held a hearing on October 25, 2023 (R. 36–69) and issued a written decision denying Gene's claims on December 28, 2023 (R. 14–31). Although the ALJ found that Gene suffered from several severe impairments—including hyperthyroidism, idiopathic peripheral neuropathy, ADHD, major depressive disorder, and psychophysiological insomnia—he determined that Gene

could still perform work at the light level, with additional limitations. (*See generally id.*) Gene appealed that decision, but the Appeals Council denied his request for review, making the ALJ's written decision the final decision of the Commissioner as of September 5, 2024. (*See* R. 1–3.)

## A.    Legal Framework

A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week, despite his medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). The ALJ makes the RFC finding between steps three and four of the five-step disability determination. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017) (citing 20 C.F.R. § 404.1520(e)). "This RFC assessment is a holistic and fact-specific evaluation; the ALJ cannot conduct it properly without reaching detailed conclusions at step 2 concerning the type and [functional] severity of the claimant's impairments." *Id.*

The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by definition "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional restriction that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). The RFC should reflect credibly established "restrictions caused by medical impairments and their related symptoms"—including those that the ALJ found "non-severe"—that impact the claimant's "capacity to do

work-related physical and mental activities" on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1, *2.

Second, the ALJ's decision must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explaining how he or she weighed any inconsistent or contradictory evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will affirm the ALJ's RFC findings when he or she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and the written decision built an "accurate and logical bridge from that evidence to his [or her] conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018), *superseded by Rule on other grounds as recognized in Rogers v. Kijakazi*, 62 F.4th 872 (4th Cir. 2023) (internal quotation omitted). *See Shinaberry v. Saul*, 952 F.3d 113, 123–24 (4th Cir. 2020); *Thomas*, 916 F.3d at 311–12; *Patterson*, 846 F.3d at 662–63.

## B. Medical Evidence

Although Gene originally claimed a disability-onset date of January 1, 2019, he amended that to May 14, 2021, at the hearing before the ALJ. (R. 40.) While Gene devotes several pages of his brief to medical records from before that date, the court confines its recitation of the medical evidence to post-May 14, 2021, except where necessary to paint a comprehensive picture of Gene's medical history.

In June 2018, Gene saw Dr. Stavola at the North Roanoke Family Practice for hives. (R. 565–66.) At that appointment, he noted his continuing issues with diarrhea and sleep problems. (R. 565.) Gene noted that he has trouble staying asleep and he wakes up early, and

that he often has problems with loose or watery stools "[a]fter eating." (R. 565–66.) Dr. Stavola prescribed additional medication to help him sleep and referred him to a gastroenterologist. (R. 566.) When Gene saw the gastroenterologist the next month, the findings were unremarkable, and Gene was advised to continue dietary changes. (R. 560–64.) Testing for celiac disease/gluten intolerance was negative, although some test results suggested hyperthyroidism, so Gene was advised to have Dr. Stavola "check his thyroid." (R. 559.)

On August 8, 2018, Gene's thyroid tests showed abnormal thyroid-stimulating hormone ("TSH"), indicating hyperthyroidism, and he was referred to an endocrinologist for follow-up. (R. 555–56.) Gene's diarrhea continued (*see* R. 547, 538–40), and when he saw Dr. Carpio, his primary care physician, on August 21, 2019, he was referred for an ultrasound of his thyroid (R. 540). Dr. Carpio also noted that Gene should receive an endocrinology referral "once he gets insurance." (R. 540.) Upon receipt of Gene's test results from the August 21 appointment, Dr. Carpio put in the endocrinology referral, noting that Gene's results indicated "likely subclinical hyperthyroidism." (R. 537.)

The ultrasound of Gene's thyroid was completed on October 8, 2019, and showed nodules indicative of malignancy on the right lobe, so Gene was referred for fine-needle aspiration of his thyroid. (R. 668–70.) That procedure was performed on January 16, 2020, and showed "[a]typical follicular cells of undetermined significance." (R. 660.)

An ultrasound of Gene's thyroid was performed again on March 28, 2020, and did not show any interval changes from the October 2019 study. (R. 652–53.)

On June 30, 2020, Gene had a telehealth appointment with Dr. Virginia O'Brien at Jefferson Psychiatric Behavioral Medicine and was diagnosed with psychophysiological

insomnia and was advised to try over-the-counter sleep aids and, if those did not work, he could try Vistaril.[1] (R. 493.) The next month, he reported that he still was not sleeping well despite taking Vistaril, so his dosage was increased. (R. 479–81.)

Gene had a telehealth appointment with an endocrinologist, Dr. Kimberly Clay, on August 18, 2020. (R. 456–63.) Noting that his thyroid levels were stable, Gene was continued on his medication (methimazole) and advised that they may stop his mediation at his follow-up in three months. (R. 463.) At his follow-up appointment with Dr. Clay on December 14, his thyroid function tests were "normal," and Gene was continued on a low dose of methimazole. (R. 441.) Gene saw Dr. Clay again in February of 2021. Again, his findings were unchanged, and he was advised to return in 12 weeks. (R. 422.)

Gene underwent an ultrasound of the head and neck on March 4, 2021, which showed that the nodules on his thyroid were "stable" when compared to his previous ultrasound. (R. 640–41.) It was recommended that, due to the probable malignancy of one of the tumors, that he return annually for review. (R. 642.)

Gene saw Dr. O'Brien for his previously diagnosed depression and anxiety on May 17, 2021, which was his first medical appointment after his alleged disability onset date. (R. 410–11.) He stated that his depression was improved, but his anxiety remained high, although he largely attributed that to conflict with his mother (with whom he lived). (R. 410.) He reported that he lost his job at the golf course and was waiting for the outcome of his prior application for "disability." (*Id.*) Dr. O'Brien further noted that some of his depression symptoms likely overlapped "with those caused by his hyperthyroidism." (*Id.*) His mental status exam showed

---

[1] Gene's medical records refer to hydroxyzine, which is also known as Vistaril. (*See* R. 480.)

that his mood was "anxious," but his affect was calm and euthymic. (*Id.*) His thought processes were "linear and logical," his insight was "fair to good," his judgment was "good," and his "[c]ognition, attention and concentration appear[ed] intact." (*Id.*) Dr. O'Brien assessed Gene with "[m]oderate episode of recurrent major depressive disorder," ADHD, and "[p]sychophysiologic insomnia." (R. 411.) Dr. O'Brien discontinued Gene's Celexa, and started him on Effexor, and continued him on Remeron to help him sleep. (*Id.*) She further recommended that he "[c]onsider seeing a therapist," noting that Gene minimized his depression and anxiety symptoms except that he noted "how much impact they have on him and his relationships and job." (*Id.*) Dr. O'Brien also noted that Gene was to start Concerta for his ADHD once he cleared a urine drug screen ("UDS"). (*Id.*)

Gene saw Dr. O'Brien again on July 2, 2021, for his depression. (R. 406–08.) His mental status exam was unchanged from his last visit except that his mood was "OK." (R. 407.) He reported that he was tolerating the Effexor well and "feels it is helping," though he reported that his sleep and attention issues persist. (*Id.*) Dr. O'Brien increased his Effexor, continued his Remeron, and against advised him to consider seeing a therapist. (R. 408.) She also recommended that he start Concerta for ADHD once he was cleared by a urine drug screen. (*Id.*)

On July 5, Gene saw Dr. Clay for a follow-up related to his hyperthyroidism. (R. 394–404.) She noted that he had a normal mood and affect and was "[v]ery pleasant[.]" (R. 399.) She further noted that he smoked marijuana "occasionally" and smoked a half a pack of cigarettes daily and had been a smoker for 30 years. (R. 397.) There was no interval change in

the nodules on his thyroid, and Dr. Clay decreased his methimazole and directed him to return in three months. (R. 402.)

Gene returned to see Dr. O'Brien on August 27. (R. 386–88.) His mental status exam was unchanged from his last visit, and while he indicated that the Effexor had benefitted his mood and made him more "mellow," the medication was causing profuse, uncomfortable sweating that did not justify the benefits. (R. 386.) He noted that although he is physically able to work, he had not been working and that the "emotional part" of working is difficult for him. (*Id.*) He stated that he "doesn't do well around other people" and "when he is around people he can overreact when there is conflict." (*Id.*) He relayed that he "hates" to go to the store but does not put off going; "[h]e just doesn't like being around people," although "[h]e can tolerate people he knows well." (*Id.*) Dr. O'Brien directed Gene to taper off and discontinue his Effexor, increased his Remeron, directed him to try exercising, and again encouraged him to see a therapist. (R. 387–88.) At the time of his appointment, Gene had still not undergone the UDS that was necessary to start him on ADHD medication. (R. 387.) Dr. O'Brien directed him to follow up in 6–8 weeks. (R. 388.)

When Gene saw Dr. Clay for an endocrinological follow up, Dr. Clay noted that Gene had "[s]table bilateral thyroid nodules," so she did not make any changes to his diagnoses or treatment plan. (R. 375–84.) He was directed to return in 11 weeks. (R. 384.)

At a follow-up with Dr. O'Brien on October 22, 2021, there were no significant changes to Gene's status. (R. 370–71.) Dr. O'Brien started Gene on Prozac, directed him to stop his nightly Remeron, and directed him to follow up in eight weeks. (R. 373.) He also reported that he had not performed the UDS because "he hasn't gotten to it." (R. 369.)

When Gene saw Dr. O'Brien again on December 16, 2021, he reported that he was having "all the issues," although he reported not feeling depressed. (R. 362–63.) He reported arguing with his mother a lot, continued sweating from his medication, and that when he missed doses of his Prozac and Effexor,[2] it felt like he was "in a fishbowl." (R. 363.) Dr. O'Brien increased his Prozac, started him on propranolol for anxiety and sweating, and continued his nightly Remeron. (*Id.*) She also discontinued the Effexor, advised him to exercise, and encouraged him to see a therapist. (R. 364.)

Gene was stable when he saw Dr. Clay for his hyperthyroidism on January 10, 2022. (R. 355.) Dr. Clay continued him on the low dose of methimazole and he was advised to return in 11 weeks. (R. 355.)

On February 10, 2022, Gene had a telehealth appointment with Dr. O'Brien, chiefly complaining of anxiety. (R. 686.) He reported continued sweating on the propranolol and was unable to tolerate the medication, as it gave him a "weird" feeling. (*Id.*) He also reported that he was working part-time at Wal-Mart and that his mood was "a little less stressed since he has money coming in." (*Id.*) He again reported problems sleeping, noting that he wakes up "hours" before his alarm goes off. (*Id.*) They also discussed that he could get a stimulant for his ADHD if he would take the UDS, which he still had not completed. (R. 687.) Gene also reported that he was tolerating Prozac and Remeron well and was continued on both. (R. 688.) He had also reported that he had quit smoking, and Dr. O'Brien replaced Gene's propranolol

---

[2] Although it appears that Dr. O'Brien discontinued it at Gene's August appointment (*see* R. 387–88), her notes indicate he was still taking the Effexor at this appointment. It also appears that he continued on Remeron nightly. (*See* R. 364.)

with glycopyrrolate for his sweating. (*Id.*) Gene was also counseled, again, about exercising and seeing a therapist. (*Id.*)

Gene saw Diane Campbell, N.P, for bilateral knee pain lasting more than 30 days on February 25. (R. 724–25.) A physical exam was unremarkable except for tenderness over the right lateral knee, and NP Campbell indicated she "may consider" a referral to an orthopedist or steroid injections but, for the time, Gene was counseled to return if the pain did not improve soon or worsened. (R. 725.) X-rays taken the next day were normal. (R. 753–55.)

Gene had bouts of nausea and vomiting on March 23 and 28, 2022. (*See* R. 711–14; 706–07.) When he went to the emergency department on March 28, a CT scan showed mild left hydroureteronephrosis (swelling of the kidney) caused by a kidney stone in his ureter (ureteric calculus). (R. 747–48.) He was diagnosed with acute ureterolithiasis and acute flank pain and was discharged in stable condition. (R. 710–11.)

At Gene's next appointment with Dr. Clay on April 4, his hyperthyroidism was stable, his medication was continued at the same dosage, and he was advised to follow up again in 11 weeks. (R. 696, 705–06.)

X-rays of Gene's abdomen on April 11, 2022, were suggestive of bilateral renal calculi (kidney stones), but there was no longer any indication of the previously diagnosed ureteric calculus. (R. 743.) The radiologist did note levoscoliosis of the lumbar spine. (*Id.*)

Gene saw Dr. Clay again on May 16, 2022, and reported no increased anxiety or insomnia, though he did report he was "still smoking." (R. 844–45.) Dr. Clay noted that nephrolithiasis was a "new problem," he was continued on his medication, and she advised him to return in 11 weeks. (R. 853.)

Gene reported to VelocityCare on July 7, 2022, with complaints of right knee pain that had started earlier in the day. (R. 840.) He reported stiffness in the joint but that he was still able to move it. (*Id.*) The physician noted swelling, effusion, and erythema in the right knee with decreased range of motion. (R. 843.) He was advised to go to the emergency department for possible sepsis in his right knee. (*Id.*)

On July 11, Gene saw Dr. Chitnavis at Roanoke Gastroenterology to follow up on his chronic diarrhea and weight loss. (R. 836.) His physical exam was unremarkable, and he was referred for a colonoscopy with biopsy. (R. 839–40.)

On September 2, Gene saw Dr. O'Brien for a telehealth appointment with a chief complaint of insomnia. (R. 831–32.) He reported that, since their last appointment in February, he had "been ok" and "hasn't had any major outbursts." (R. 832.) He said that "[h]e tries to stay away from people" and that "they tried to fire him at work," but that was because of absenteeism related to his other health problems (kidney stones, bursitis in his knee, etc.). (*Id.*) He reported he was doing "fairly well" with his ADHD and that, although he "does tend to forget things sometimes," "[h]e recognizes that some of that is due to smoking cannabis." (*Id.*) Gene reported that he was taking his medications regularly and did not feel depressed. (*Id.*) His mental status exam was unremarkable apart from his insight appearing "fair to good" and his mood reported as "alright." (*Id.*) He was assessed with anxiety and cannabis dependence and Dr. O'Brien continued him on Prozac and Remeron at the same dose. (R. 833.) He was again advised to get some exercise and "[c]onsider seeing a therapist." (*Id.*) And, again, he was advised that, if he submitted a UDS, he would be able to be prescribed medication for his ADHD. (*Id.*)

Gene saw Dr. O'Brien again on December 5, 2022, for a telehealth appointment, chiefly complaining of depression. (R. 827.) He reported that he "got upset at work and didn't say anything, but walked off." (*Id.*) He also reported that there was a new manager at his work "and she tried to change things, which he doesn't tolerate that well." (*Id.*) He also told Dr. O'Brien that his girlfriend's father, with whom he was close, died recently and that the loss had been "hard on him." (*Id.*) He reported taking his medications as prescribed and said that his mood was "ok." (*Id.*) He continued to report trouble sleeping, indicating that he "doesn't have much energy after he is done with work" and "finds it easy to go to sleep" but wakes early in the morning and cannot go back to sleep. (*Id.*) He also reported that he "continues" to smoke cannabis "daily." (*Id.*) His mental status was unchanged from his last visit, and Dr. O'Brien swapped out Gene's prescription for Remeron for one for Zyprexa for his insomnia. (R. 828.)

Gene returned to Dr. Clay for an endocrinological follow up on January 3, 2023. (R. 815.) He again denied and increased anxiety or insomnia and was noted to be stable. (R. 817, 825.) Gene was advised to return again in 11 weeks. (R. 825.)

Gene saw Dr. Carpio on March 1, 2023, complaining of foot and right-knee pain that had been ongoing "for many months." (R. 811.) Gene described the pain as "sharp, needle-like pain" that was "worse with walking." (*Id.*) A physical exam yielded normal results, and Gene was referred for an ankle-brachial index study for idiopathic peripheral neuropathy. (R. 812–13.) A doppler arterial study of the lower extremities (performed on March 31) showed that ankle-brachial index was "within normal range bilaterally." (R. 880.)

Gene saw Dr. Clay on March 22, 2023, but there was no change to his medical assessment or treatment, and he was advised to return in 12 weeks. (R. 801, 810–11.)

At a May 15, 2023 appointment with Dr. O'Brien, Gene reported that he continued to be irritable at work and that it "doesn't take much to set him off" and that he "is struggling with changes they are trying to make." (R. 798.) He advised that he was hoping to transfer to a store "closer to his house" and that he had just returned from a vacation to Disney, "which he enjoyed." (*Id.*) He further opined that his medications were not helping his irritability, but that he "think[s] its just [him]." (*Id.*) His mood was stable and his mental-status exam was unremarkable. (*Id.*) Dr. O'Brien stopped the Zyprexa, restarted the Remeron, advised him to exercise, and recommended that he see a therapist. (R. 799.)

Gene had a UDS on May 18, 2023, that was positive for THC/marijuana. (R. 869.) It appears that Dr. O'Brien prescribed Vyvanse for his ADHD sometime thereafter. (*See* R. 767 (noting that Gene's Vyvanse prescription was awaiting a prior authorization in July 2023).)

Gene saw Dr. Clay on June 21, 2023, but there was no change to his medical assessment or treatment, and he was advised to return in 12 weeks. (R. 770, 780.)

At an appointment with Dr. O'Brien on July 10, Gene advised that he had a "short fuse" and, when asked why he gets upset, he relayed that he goes "above and beyond" for his job and he "likes to help people." (R. 767.) He indicated problems at home with his mother, who he described as "mad at the world." (*Id.*) He advised that things had gotten "so bad" at home that he was going to ask to move in with his sister. (*Id.*) He said that his mother "won't even let him have his friends over" and that, "if he was able to move, he would likely feel better." (*Id.*) He also reported that he "smokes a lot of cannabis." (*Id.*) His medical records

- 14 -

indicate that Dr. O'Brien restarted the Zyprexa because "he couldn't sleep off of it." (*Id.*) His mental-status exam was unremarkable, so Dr. O'Brien continued him on Prozac, advised him to exercise, and recommended that he see a therapist. (R. 768–69.)

## C.    Opinion Evidence

On initial review of Gene's applications, state agency examiners Robert McGuffin, M.D., and Howard Leizer, Ph.D., opined that, while Gene suffers from several medically determinable impairments, none of them were "severe" and, accordingly, opined that he was not disabled. (R. 104–09.) In so doing, Dr. McGuffin noted that Gene's thyroid "nodules are stable and his most recent thyroid lab work is normal." (R. 106.) He also noted that Gene "reported that he is able to physically work." (*Id.*) Dr. Leizer noted that Gene "is able to work a part-time job at Walmart, has no serious issues with personal care, and cook[s] full meals. He reports that he is not able to get along with others but also reports spending time with friends and is able to go out alone. His mental conditions are not severe." (R. 107.)

At the reconsideration level, state agency examiners Joseph Leizer, Ph.D., and Jack Hutcheson, M.D., likewise concluded that, although Gene had several medically determinable impairments, none of them were "severe." (R. 111–17.) They specifically cited the multiple psychiatric appointments at which Gene reported being "OK," his calm affect, his statements to his physicians that he is "less stressed since working part time at Walmart," and his activities of daily living, including his ability to "maintain his attention for up to 1 hour and playing games on his phone." (R. 115.)

## D.     Relevant Testimony

In a function report submitted in support of his application, Gene stated that he has "problems concentrating and can't multitask." (R. 277.) He also stated that he has "a difficult time getting along with others" and that he "get[s] upset easily and lash[es] out." (*Id.*) Gene reported that he loses focus "easily" and needs instructions "repeated several times." (R. 282) He also stated that he lost a previous job at Infoseal because he "got into arguments with [his] boss and other employees," although he reported that he gets along "[a]lright" with authority figures "unless there is a[n] issue." (*Id.*) Gene said that his back and knee pain "make[] it difficult to get around" and causes several postural limitations. (R. 277, 282.)

As for his abilities, Gene detailed that he has a part-time job, working three days a week from 10 a.m. to 7 p.m. (R. 278.) Both he and his mother share responsibilities for taking care of animals, and prepares meals—such as "sandwiches, chicken, spaghetti, pork chops"—daily, spending 10–30 minutes cooking that has been unaffected by his illnesses. (R. 279.) He also does dishes daily and laundry 3–4 times a month, though that chores "take[] all day because [he] forget[s] that [he's] doing laundry." (*Id.*) He also shops for groceries twice a month for about an hour each time. (R. 280.) Gene also reported that he has "never been very social" and that he is not really a "people person." (R. 281.)

At the hearing before the ALJ, Gene testified that he had been working part-time at a Walmart marketplace approximately 44 hours a week.[3] (R. 44.) At that job, he was on his feet "all day long." When he transferred to a new Walmart closer to his home, he started working

---

[3] Gene may have been mistaken about his hours, as he also testified that he worked 10 a.m. to 7 p.m. three days a week (R. 46), which would amount to 36 hours per week. In any event, the ALJ considered that Gene worked 24 hours per week. (*See* R. 24.)

- 16 -

in the electronics department, but he had found it "really hard . . . finishing his job" because "it's a bit overwhelming at times." (R. 46.) He testified that, "a lot of times" he is by himself "running the electronics [department] and the photo lab" by himself. (R. 47.) Specifically, he said he has problems with "the interaction with people" because of "the way they approach" him when he is "aggravated" or "just annoyed because [he has] so much to do." (R. 47–48.) As Gene testified: "I have no help, and I got customers up the wazoo and I start making mistakes and, you know, that type of thing . . . ." (R. 48.) He reported that he gets "easily" overwhelmed but, if he is able "to not be on the register," he's "fine." (*Id.*) When asked what prevents him from working full time, Gene responded, "It's just too much right now. It is way too much. I mean, the fact that they don't train you. They don't do anything." (*Id.*)

Gene is normally tired, both mentally and physically, after his shift. (R. 48–49.) He does not believe he could "handle it five days a week, eight hours a day." (R. 49.) But he testified that the only absences he has had at work came from when he was "sick and had kidney stones" and one time when he was on crutches because, as he said, "they ain't got nothing for me to do on crutches[.]" (*Id.*)

Gene also relayed that his insomnia often wakes him up before his alarm goes off "at 5:30 -- quarter to six." (R. 50.)

Physically, Gene testified that he has arthritis in his joints, specifically his wrists, knees, and elbows, although it isn't as severe in his elbows as elsewhere, and the join pain "comes and goes." (R. 50–51.) He has back pain from his scoliosis and, because he is tall, when he "pick[s] up stuff wrong" and "tweak[s]" his back, the pain is worse. (*Id.*) The pain in his hands makes it difficult for him to hold onto things and "its starting to get hard for [him] to open

- 17 -

stuff like bottle tops." (R. 52.) He also testified that he has plantar fasciitis in his right foot that bothers him; new insoles in his shoes did not offer him any relief. (R. 52–53.) When his feet hurt at work, he usually stands on an anti-fatigue mat at the cash registers. (R. 53.) When he gets home, "all [he] want[s] to do is just get off [his] feet." (R. 54.) But despite his physical impairments, Gene never asks for extra breaks at work: "No. No. No." (R. 53.)

Gene relayed that his ADHD "affects [him] greatly." (R. 54.) He testified that he takes medicine for it, "and it helps a little bit but it's the same struggles." (*Id.*) He indicated that "the distractions" and his "trouble finishing things" are the main struggle. (R. 54–55.) When he started work, he tried to explain to his team leader that he can only do one thing at a time and that he needs to finish that before he can start something else, "[b]ut [he] cannot do 50 things at one time. [He] cannot do that." (R. 55.)

His anxiety and depression also affect him daily. His stress aggravates his anxiety, which in turn "play[s] a part in [his] difficulty interacting with people." (R. 56.) And although he doesn't socialize much with friends, he testified that he never has; he stated that he is just "not wired that way." (R. 56–57.) Gene testified that smoking marijuana helps with his anxiety. (R. 60.)

Gene testified that he lives in a single-wide trailer with his mother and, although he does not cook now because a fire destroyed their kitchen, he "love[s] to cook" and is good at it. (R. 58.) He is able to do other household chores but has difficulty finishing them because "[t]here's so much . . . going on." (R. 59.)

A vocational expert ("VE") also testified and opined that, given the hypotheticals posed by the ALJ, Gene could perform his past relevant work as a reel tender and grocery clerk. (R.

65.) She also testified that there were a number of light jobs in the national economy that Gene could perform, such as postage machine operator, price marker, and final job routing clerk. (*See* R. 65.) On cross examination, Gene's attorney asked if adding a limitation that he is "unable to do any kind of tandem work tasks" would limit the jobs she cited; the VE indicated it would not. (R. 66.)

**E.    The ALJ's Opinion**

In the operative decision, the ALJ concluded that Gene suffered from: "hyperthyroidism, idiopathic peripheral neuropathy diagnosed in 2023, right knee bursitis, major depressive disorder, attention deficit hyperactivity disorder (ADHD), anxiety, psychophysiological insomnia, and cannabis dependence." (R. 17.) He found that Gene did not suffer from "an impairment or combination of impairments" that met or medically equaled one of the listed impairments in the applicable regulations. (R. 18.) "After careful consideration of the entire record," the ALJ found that Gene had the RFC

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he can occasionally balance, stoop, kneel, crouch, crawl, or climb. He can frequently, but not constantly, reach, handle, and finger bilaterally. He can work at a job that can be learned in 90 days or less. Interaction with others (the public, coworkers, and supervisors) should be at a total of occasional for a full workday.

(R. 22.) The ALJ found that Gene could perform his past relevant work as a reel tender, and he determined that a significant number of jobs exist in the national economy that Gene could perform, such as postage machine operator, price marker, and routing clerk. (R. 29–30.) Accordingly, the ALJ concluded that Gene was not under a disability from May 14, 2021, through the date of his decision. (R. 30.)

### III.  ANALYSIS

Gene makes three generic objections to the ALJ's decision. First, he contends that the ALJ's assessment of his mental impairments is not supported by substantial evidence. Second, he argues that the ALJ's assessment of his physical impairments and RFC findings are not supported by substantial evidence. And finally, he maintains that the ALJ erred in his assessment of his allegations, and that his assessment of *those* was not supported by substantial evidence. None of his arguments are persuasive.[4]

A.  Mental Impairments

The crux of Gene's first argument is his contention that "[t]he ALJ does not explain how [Gene's] moderate limitations in interacting with others are addressed or accommodated by the ALJ's RFC findings and consequently, his findings are not enough to fulfill" the mandates of Social Security Rule ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996). (Pl.'s Br. pg. 21.) The court disagrees.

SSR 96-8p details how an ALJ must make an RFC assessment and requires the ALJ to "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions" listed elsewhere in the regulations. SSR 96-8p, 1996 WL 362207, at *34475 (July 2, 1996). Listed mental functions include a claimant's "limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co[-]workers, and work pressures in a work setting." 20 C.F.R. §§ 404.1545(c) (DIB), 416.945(c) (SSI). But "the ALJ's failure to conduct a

---

[4] While Gene's recitation of the medical evidence is thorough, his argument ignores the record and applicable law, relying instead for boilerplate arguments and scant analysis. (*See generally* Pl.'s Br. pgs. 20–31 [ECF No. 10].)

function-by-function analysis does not necessarily result in automatic remand." *Humphries v. Colvin*, No. 3:15-cv-188, 2015 WL 9942619, at \*4 (E.D. Va. Dec. 31, 2015), *R&R adopted by* 2016 WL 356086 (E.D. Va. Jan. 28, 2016). Instead, "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (cleaned up). And SSR 96-8p requires that the ALJ "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." 1996 WL 362207, at \*34478. That narrative discussion should describe the claimant's ability to perform "sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." *Id.* The ALJ "must also explain how any material inconsistencies or ambiguities . . . were considered and resolved." *Id.*

The ALJ's thorough and well-reasoned decision satisfies the requirements of SSR 96-8p. Gene cites only the ALJ's discussion of his conclusion that he has a moderate limitation in interacting with others as deficient,[5] but the court is satisfied that the ALJ's discussion explains the reasons for his conclusion. As it relates to the record evidence, the ALJ pointed out that, at all of his medical appointments, Gene interacted with his providers normally. (R. 20.) His providers routinely noted that he did not "have deficiencies in eye contact, speech, or

---

[5] It is important to note that Gene does not challenge the conclusion that he has only a moderate limitation in this functional area, only that the ALJ's *discussion* of it was insufficient.

conversation." (*Id.*) The ALJ noted Gene's activities of daily living, such as grocery shopping twice a month for approximately an hour. The ALJ considered Gene's work "in a public-facing position at Walmart three full days per week." (*Id.*) And in his function report (which the ALJ cited), Gene reported that he makes meals "daily" for between 10–30 minutes and spends time with his friends. (R. 279.)

While Gene contends that the ALJ "failed to properly consider the evidence of record documenting plaintiff's struggles to interact with other at work and that these struggles . . . would substantially increase if he tried to work full time" (Pl.'s Br. pg. 23), he is incorrect. [6] The ALJ expressly considered this evidence in detail:

> [Gene] endorsed problems getting along with others became "very irritable and angry easily and lash out." He stated he had never been very social, and he was not really a people person. He indicated he got along "alright" with authority figures "unless there is an issue." He stated he got into arguments with his boss and other employees at a prior job at Infoseal. Due to the claimant's complaints of irritability and difficulty interacting with others, the claimant is limited to no more than occasional, in total, interaction with the public, coworkers, and supervisors.

(R. 20.) As a result, on the whole, the court is satisfied that the ALJ considered the relevant evidence of the record and rendered a decision supported by substantial evidence, and his

---

[6] Insofar as Gene says his struggles would "substantially increase" if he were to work 2 more days per week, that argument carries little weight as it does not account for the ALJ's limitation to only "occasional" interaction with the public in his RFC. To argue that limiting Gene to *less* interaction with the public than he currently has three days per week would cause his issues to "substantially increase" is an inferential leap that he makes to attempt to support in his brief. It also ignores that the ALJ *did not* consider whether Gene's past work as a grocery clerk (which presumably was his Walmart marketplace job) could be performed by someone with Gene's RFC (although the VE did). (*See* R. 65.) Moreover, it is not supported by the VE's testimony that excluding Gene from any "tandem work tasks" would not eliminate any of the jobs she cited in her testimony as appropriate for Gene's RFC. (*See* R. 66.)

explanation of the mental limitations in Gene's RFC more than passes muster under SSR 96-8p.

B. Physical Impairments

For his second argument, Gene alleges that the ALJ "never made specific findings regarding whether [his] impairments would necessitate [him] taking breaks during the day or result in absences from work and[,] if so, how many times per month." (Pl.'s Br. pg. 25 [ECF No. 10].) This argument is curious,[7] because Gene testified that he is on his feet "all day long" and "never" takes extra breaks at work and that his *only* absences at work came from acute illnesses (kidney stones and being on crutches). (R. 44, 49, 53.) Aside from being tired at the end of his workday, he does not cite to *anything* in the record that would establish such a limitation should have been included in his RFC. It is well-settled that "[a] claimant has the burden to prove the extent of his functional limitations; it is not the ALJ's burden to prove a lack of limitations." *Hendrickson v. Berryhill*, No. 1:16-cv-00367-MOC-DLH, 2018 WL 1431751, at *7 (W.D.N.C. Mar. 22, 2018) (citing *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013)). Gene's passing references to "complaints of pain and not sleeping well" (Pl.'s Br. pg. 25) fall far short of satisfying his burden to "prove the extent of his functional limitations," and his argument is without merit.

C. Subjective Allegations

For his final bid in an effort to overturn the ALJ's decision, Gene contends that the ALJ's assessment of his subjective allegations is not supported by substantial evidence.

---

[7] It is also incorrect, as the ALJ's failure to include such a limitation in the RFC indicates conclusively that he did not believe such a limitation was supported by the medical evidence, a conclusion that is supported by substantial evidence.

When evaluating a claimant's subjective complaints, "ALJ's must use the two-step framework set forth in 20 C.F.R. § 404.1529[8] and SSR 16-3p." *Arakas v. Comm'r of Soc. Sec.*, 983 F.3d 83, 95  (4th Cir. 2020) (cleaned up).

> First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how the affect the claimant's ability to work and whether the claimant is disabled. At this step, objective evidence is *not* required to find the claimant disabled. SSR 16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." Thus, the ALJ must consider the entire case record and may not "disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them.

*Id.* at 95 (quoting SSR 16-3p, 2016 WL 1119029, at *4–5 (Mar. 16, 2016)). A claimant is "entitled to rely exclusively on subjective evidence to prove the second part of the test." *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006). And if the ALJ chooses to reject a claimant's subjective allegations, "he must explain the basis for such rejection to ensure that the decision is sufficiently supported by substantial evidence." *Mabus v. Colvin*, No. 4:13-cv-3028-TER, 2015 WL 1400053, at *15 (D.S.C. Mar. 26, 2015). "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029, at *9.

---

[8] And 20 C.F.R. § 416.929.

At the outset, it is worth noting that Gene does not dispute that the ALJ applied the proper legal framework, as the ALJ accurately described the two-step process and expressly noted that "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." (R. 23.) With that in mind, the court is satisfied that the ALJ explained his reasons for discounting Gene's subjective allegations and that his conclusion was supported by overwhelming evidence in the record.

Gene first contends that, because "the ALJ's assessments of [his] mental and physical impairments are not support by substantial evidence," it follows that the ALJ's "conclusion that the medical evidence does not support [his] allegations is also not supported by substantial evidence." (Pl.'s Br. pg. 27.) For the reasons discussed above, *supra* § III.A & III.B, the court disagrees.

Next, Gene argues that, in relying on his daily activities to support his findings, the ALJ "did not acknowledge the extent to which [he] performed the activities and ignored other significant testimony from [him]." (Pl.'s Br. pg. 27; *see generally id.* at 27–31.) Gene is, of course, correct on the law; "[a]n ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them." *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). But that is not what happened here. Rather, the ALJ made *specific* reference to how often many of those activities were performed. Referencing Gene's functional report, the ALJ noted:

> He indicated daily activities including watching TV, playing games on his phone, tinkering with things, working ***three days a***

> *week,* sitting around, and eating. He took care of animals with help from his mother. He reported no problems performing personal care. He did not need special reminders to take care of personal needs and grooming or to take his medication. He was able to prepare meals including sandwiches, chicken, spaghetti, and pork chops. He did household chores, such as laundry and dishes, but he said his mom did a lot of the household chores. He was able to drive a car and go out alone. He shopped in stores for groceries *twice per month for approximately one hour.* He was able to pay bills, count change, handle a savings account, and use a checkbook/money orders. He spent time with his friends *a few times per month*, and he went to work *three days per week*.
>
> . . .
>
> When working at the Walmart market, he estimated the heaviest thing he lifted was a case of canned vegetables, and he was on his feet *all day long*. He noted that he started working *from 10 AM to 7 PM* then his schedule was changed to *8 AM to 5 PM*. He indicated that he worked *approximately 24 hours a week* and he made $14 an hour. He stated he needed help lifting big TVs. He reported that he had to do multiple tasks *throughout the day* including running the electronics and photo lab by himself.

(R. 23–24 (emphasis added).) While Gene clearly disagrees with the ALJ's conclusion, it is not fair to say that the ALJ simply did not consider the frequency with which Gene engaged in his various activities. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) ("The issue . . . is not whether Craig is disabled, but whether the ALJ's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law.")

Relatedly, Gene argues that the ALJ acknowledged that his part-time "work did not rise to the level of" substantial gainful activity, presumably meaning that it was improper for the ALJ to therefore consider that he works three days a week. Gene is plainly wrong.

Under the applicable regulations, which the ALJ expressly cited,

> The work, without regard to legality, that you have done during any period in which you believe you are disabled may show that you are able to work at the substantial gainful activity level. If you

are able to engage in substantial gainful activity, we will find that you are not disabled. . . . ***Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did.*** We will consider all of the medical and vocational evidence in your file to decide whether or not you have the ability to engage in substantial gainful activity.

20 C.R.F. § 404.1571 (emphasis added); *see also* 20 C.F.R. § 416.971. Obviously, it was entirely proper for the ALJ to consider that Gene worked 24 hours a week at a physically demanding job, never took extra breaks, and only missed work for acute illnesses when determining whether he is disabled. His arguments to the contrary do not persuade the court, and the decision of the Commissioner will be affirmed.

## IV.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision will be affirmed.

**ENTERED** this 31st day of March, 2026.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE